UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
:
MATTHEW VERDUCCI,                                    :
                Plaintiff,            :         Civil Action No.
:
v.                                                   :
:
APOLLO LLC and DAVID HANCOCK,                        :         NOTICE OF REMOVAL
              Defendants.          :
:
-----------------------------------------------------------X

      PLEASE TAKE NOTICE that defendants Apollo LLC[1] and David Hancock

(collectively, "Defendants"), through their undersigned counsel, hereby remove this action from

the Supreme Court of the State of New York, New York, County of Westchester, to the United

States District Court for the Southern District of New York and state:

      1.      Plaintiff Matthew Verducci ("Plaintiff") commenced this action by Summons and

Complaint filed with the Westchester County Clerk on June 10, 2025.

      2.      Defendants first became aware of the lawsuit on July 22, 2025, when Plaintiff

first attempted to effect service. This Notice of Removal is being filed within thirty (30) days of

receipt of the Summons and Complaint, as required by 28 U.S.C. §1446(b).

      3.      This case is a civil action over which the District Court has original jurisdiction

pursuant to 28 U.S.C. §1332 and is one which may be removed to this Court by Defendants

pursuant to 28 U.S.C. §1441.

      4.      Attached to this Notice of Removal as Exhibit A is a copy of Plaintiff's Summons

and Complaint.

---

[1] Plaintiff misnames the name of his former employer. The correct name of the entity is Apollo MIS, LLC ("Apollo").

5.  In accordance with 28 U.S.C. §1446(b), a Notice Regarding Removed Action shall be given to all parties and filed with the Supreme Court of the State of New York (County of Westchester). See Exhibit B.

6.  By filing this Notice of Removal, Defendants do not waive any defenses, either procedural or substantive, which may be available to them.

Dated: July 30, 2025                      Respectfully,
     Stamford, Connecticut

                                   By: */s/ Mark S. Gregory*
                                       Mark S. Gregory (MG0914)
                                       Martin LLP
                                       One Landmark Square
                                     Stamford Connecticut 06902
                                     Tel: (203) 973-5210
                                     Fax: (203) 973-5250
                                     E-Mail: mgregory@martinllp.net

                                     *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2025, a copy of the foregoing Notice of Removal is being filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Courts electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

<div style="margin-left: 40%;">

By: */s/ Mark S. Gregory*

Mark S. Gregory (MG0914)
Martin LLP
One Landmark Square
Stamford Connecticut 06902
Tel" (203) 973-5210
Fax: (203) 973-5250
E-Mail: mgregory@martinllp.net

</div>

# EXHIBIT A

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF WESTCHESTER

|  |  |  |
|---|---|---|
| MATTHEW VERDUCCI<br>24442 Moonfire Drive<br>Dana Point, CA 92629, | * | |
| | * | Civil Action No.: _____ |
| Plaintiff, | * | |
| v. | * | JURY TRIAL DEMANDED CVP § 4102 |
| APOLLO LLC<br>7 Renaissance Square<br>2nd Floor<br>White Plains, NY 10601, and | * | |
| DAVID HANCOCK<br>c/o Apollo LLC<br>7 Renaissance Square<br>2nd Floor,<br>White Plains, NY 10601 | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT FOR MONEY DAMAGES

MARY ANN KRICKO
25 East Spring Valley Avenue
Maywood, NJ 07607
and
7 Penn Plaza, Suite 1606
New York, NY 10001
(551) 486-3549
maryannkricko@me.com

JEFFREY E. MCFADDEN
Law Offices of Jeffrey E. McFadden, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
(443) 272-4737
jmcfadden@jmcfaddenlaw.com

1

Plaintiff, Matthew Verducci, by and through undersigned counsel, files his Complaint against Defendants, Apollo LLC ("Apollo" or the "Company") and David Hancock. In support thereof, Plaintiff states as follows:

## JURISDICTION AND VENUE

1.      This case is subject to the jurisdiction and venue of the Supreme Court Civil Division , Westchester County.  The amount in controversy is in excess of $100,000.00.

2.      Defendants Apollo LLC and David Hancock are subject to the jurisdiction of New York as a business entity and person doing business in New York through the following actions: a) the recruitment and hiring of Plaintiff by a New York-based corporate officer to work in a New York-based entity, b) a New York-based entity entering into a contract of employment with Plaintiff at the direction of a New York-based corporate officer, c) Defendants' commission of various illegal and/or unethical activities in New York witnessed by and complained of by Plaintiff, d) the forging in New York of a document purported to have been signed by Plaintiff, and e) the wrongful termination of Plaintiff by a New York-based business entity at the direction of a New York-based corporate officer.

## PRELIMINARY STATEMENT

### The Contractual Employment Relationship

3.      This case arises from the breach of an employment agreement entered into between Plaintiff and Defendant Apollo at the direction of its Chief Executive Officer, Defendant David Hancock.  Apollo is in the business of sports science or, as Apollo likes to call it, "athlete management systems." The "system" is essentially a type of proprietary software that breaks down athletic performance into a mass of digital metrics the analysis of which can predict injuries, recommend optimal strength and conditioning strategies, and maximize overall athletic

performance.

4.      Plaintiff Verducci is Naval Academy graduate and former Naval Officer who has developed substantial, sought-after expertise in sports science as well as having an impressive array of entry points into the U.S. military and collegiate and professional sports organizations that have a keen interest in maximizing the performance of their military members and athletes. It was for those reasons that, in December 2022, Defendant Hancock began to woo Plaintiff to join the Apollo team for the express purpose of increasing its sales after the parties initially met at the Major League Baseball meetings in San Diego, California.

5.      Through a series of material misrepresentations, Hancock convinced Plaintiff to enter into an employment agreement with Apollo. The written agreement was consummated on March 28, 2023. Among other things, the contract made clear that Plaintiff would be reporting directly to Hancock. As part of those intentional misrepresentations, Plaintiff received his first job offer on March 14, 2023. Defendant Hancock listed a quota of 4 deals per quarter at $240,000.00 and an annual quota of $960,000.00. But from experience, Plaintiff later learned that most Apollo's contracts were $30,000.00 or less. The software sold for much less than what was misrepresented by Hancock.

6.      When Plaintiff officially joined Apollo in May, there were less than 10 employees in the company.

**Defendant Hancock's Personal Misconduct**

7.      Plaintiff soon learned that Hancock was an abusive, dysfunctional manager whose modus operandi was to insert himself into deals Plaintiff and colleague Michael Macri (hereafter "Macri") had worked hard to negotiate and bring in, lose the deals as the result of his total lack of subject matter knowledge and dearth of marketing skills, and then blame Plaintiff and Macri for the lost business. Macri is an Australian sports scientist who at the time of the relevant allegations in this Complaint, was employed at Apollo. Macri was responsible for the majority of sales at

3

Apollo prior to Plaintiff's arrival.

8. Hancock also repeatedly shut Plaintiff out of pursuing any number of promising leads with professional sports teams and leagues. Plaintiff intended to pursue the New York Knicks and MLS teams and was precluded by Hancock from doing so.

9. Hancock's mistreatment of Macri came to a head in July 2023, when Hancock threatened to fire him, agreed to allow Plaintiff to have Macri work under Plaintiff and set a target date for the end of his employment so that Macri could renew his work visa, and then went back on his word and fired Macri anyway.

**Apollo's Violations of New York Law Through Hancock's Illegal Conduct**

10. Plaintiff became aware of Hancock's penchant for backdating and falsifying important documents, including the sending of emails through Plaintiff's email account given the unwillingness of Apollo clients to communicate with anyone other than Plaintiff. On December 18th, 2023, Hancock created a lengthy employment contract between Plaintiff and Apollo and forged Plaintiff's e-signature, backdating it to April 1, 2023. Hancock included a San Diego address at which Plaintiff has not resided since 2019.

11. Significantly, Hancock, on behalf of Apollo, engaged in other illegal transactions in violation of New York law. Hancock tried to persuade Michael Macri to execute a non-disclosure agreement ("NDA") since Apollo was undergoing its SOC-2 Compliance and was not prepared to fulfill such compliance successfully unless it engaged, as it did, in violation of the SOC-2 Compliance requirements. Macri refused to sign the backdated documents provided by Hancock and was terminated as a result. Hancock went through the exact process with Plaintiff after Macri refused by misrepresenting that Plaintiff, as an employee of Apollo, had to execute the NDA for SOC-2 Compliance. Plaintiff refused and advised Hancock that he would not backdate any documentation because it was illegal.

12. As part of other illegal conduct on the part of Hancock in his management of

Apollo, the vice-president of the Florida Panthers had a discussion with the Plaintiff regarding Apollo's creation of fake emails sent from Plaintiff's email account to the Panthers.

13. Apollo retaliated against Plaintiff because he objected to and refused to participate in Hancock's illegal practice of misrepresenting the company's status in industry certifications and auditability standards since potential clients would strongly consider and evaluate such standards as a pre-requisite for doing business with Apollo. But Apollo was continuously misrepresenting such standards, more specifically its obligations regarding SCO-2 Compliance and Organization Controls for its cybersecurity framework. Hancock personally made those misrepresentations and later asked Plaintiff and Macri to support them. Apollo ultimately retaliated against Plaintiff and Macri for advising Apollo that they would not participate in any intentional backdating of documents because it was illegal to do so. Apollo fired both Plaintiff and Macri.

14. SOC-2 (System and Organization Controls 2) is a compliance standard developed by the American Institute of Certified Public Accountants ("AICPA"), designed to ensure that service organizations like Apollo securely manage customer data. SOC-2 reports provided assurance to clients of Apollo had implemented appropriate security controls to protect security, availability, processing integrity, confidentiality and the privacy of their data. The purpose of these controls is to protect networks and software systems against unauthorized access.

15. The intentional backdating of a SOC-2 report constitutes fraudulent conduct with the intent to deceive or mislead others, particularly in regulated contexts or contractual relationships. The backdated report was used to obtain a benefit, mislead a regulatory authority, and fulfill a contractual obligation under false pretenses.

**The Statutory Violations**

16. **N.Y. Comp. Codes R. & Regs. tit. 2 § 1.9:** This regulation states that any person who knowingly, with intent to defraud, presents for audit, allowance, or payment any false or fraudulent verified, signed, or certified claim, bill, account, or document is guilty of a felony.

Backdating an SOC-2 report falls under this provision because the misrepresentation was made with the intent to defraud, and the document is presented in a context in which it is relied upon for audit, payment, or other official purposes.

17.    **N.Y. Comp. Codes R. & Regs. tit. 19 § 197-4.8**: This regulation prohibits fraud, misrepresentation, and dishonesty. Backdating an SOC-2 report is misrepresentation and dishonesty, particularly as it was used to deceive prospective stakeholders (as was the case here) or regulators about the timing of compliance or certification.

18.    **New York General Business Law § 899-BB.**  Under § 899-BB, a person or business like Apollo is required to develop, implement, and maintain reasonable safeguards to protect the security, confidentiality, and integrity of private information. Compliance with certain federal or state data security regulations and specific New York regulations, may satisfy this requirement.  Private information must be protected. Small businesses fall within the purview of the New York General Business Law.

19.    Apollo would automatically be deemed a business that must be compliant with New York's data security requirements.  It failed to meet the reasonable security requirements outlined in § 899-BB, in violation of the law, subject to enforcement by the New York Attorney General. Apollo's business data security practices failed to meet the statutory standards.  To further defraud its customers, Hancock asked both Macri and Plaintiff to participate in the fraud.  They both advised that such conduct constituted fraud and potential illegal activity.  At this time, they both became whistleblowers in accordance with New York Labor Law Section 740.

**Additional Fraudulent and Illegal Conduct**

20.    When Plaintiff would negotiate and close deals, such as a 3-year deal with the University of Alabama football program, Hancock falsely claimed that Plaintiff was not responsible for closing the deals and refused to give Plaintiff credit for them.  Plaintiff also spent a significant amount of time calming down clients who were upset with Hancock for having misled

them.

21.     In November 2023, in contravention of Plaintiff's employment contract, Hancock hired a "direct line manager" named Bo Wandell. Wandell wasted no time in telling Plaintiff he was unqualified to report directly to Hancock and mocked Plaintiff's leadership and operational experience as a former naval officer and veteran.

22.     Wandell was simply doing Hancock's dirty work; specifically, gaslighting Plaintiff because Plaintiff had been pointing out to Hancock for months the extraordinarily hostile work environment he had created and over which he presided, his repeated material misrepresentations to current and prospective clients, and his mistreatment of Plaintiff and other employees.

23.     To that end Wandell, in assistance and under the direction of Hancock, repeatedly recorded group video calls without Plaintiff's consent and over his objections. While the calls purported to be "performance reviews," their sole and actual purpose was to harass, abuse, and attempt to intimidate Plaintiff in retaliation for the abuses and maltreatment Plaintiff had repeatedly pointed out to Hancock as a whistleblower, which Plaintiff continued to point out on the video calls, including but not limited to forcing employees to work without contracts, verbally abusing employees to suppress valid feedback and selectively applying procedural compliance when consistent with Hancock's agenda.

**The Termination of Plaintiff's Employment**

24.     In one final recorded call on December 18, 2023, Plaintiff advised Hancock that, despite the fact that the working environment at Apollo had become intolerable, Plaintiff would finish out the duration of his employment contract and suggested that a severance plan be put into place whereby Plaintiff could assist the company in finding and training a replacement. Hancock abruptly responded by saying, "I'll do you one better. I'm not paying you for this pay period. You're done today and you will not receive another dollar." This grotesque statement was classic Hancock given that fact that Plaintiff had not received a single penny in the sales commissions due

and owing to him. Plaintiff also alerted Hancock that he was not an at will employee and that he had a contract. Hancock replied, "It's your lawyers versus my lawyers then."

25.     Later that same day, an Apollo employee sent Plaintiff an 18-page document purporting to be an at-will employment agreement dated April 1, 2023, and on which Plaintiff's signature had been forged.

26.     To date, Apollo and Hancock have not paid Plaintiff any of the commissions and a significant portion of the salary due and owing to him.

## PARTIES

27.     Plaintiff Matthew Verducci in an individual resident in the State of California.

28.     Defendant Apollo LLC is a limited liability company organized under the laws of the State of New York. Apollo is a wholly-owned subsidiary of Apollo V2, a United Kingdom Company.

29.     Defendant David Hancock is the chief executive officer of Apollo LLC and is a citizen of the State of New York.

## GENERAL ALLEGATIONS

30.     Plaintiff Matthew Verducci is a 2014, graduate of the U.S. Naval Academy and a Qualified Surface Warfare Officer. Lieutenant Verducci served onboard USS ESSEX and was primarily responsible for the safe navigation of the 253-meter warship. After three years in the surface fleet, he laterally transferred to the Navy Special Warfare Community, where he graduated as the Officer-in-Charge of Basic Underwater Demolition/SEAL Training (BUD/S) Class 331. (The Navy holds seven BUD/S classes annually.).

31.     After leaving the Navy, Plaintiff found a home in the sports technology industry, refining his skills in business development and customer success. Lieutenant Verducci utilized cutting edge technology while rehabbing from surgery in the Navy Special Warfare community,

and one of those vendors, a company known as Sparta Science (recently acquired by Oura Ring), hired him to travel the country and develop relationships with high performance organizations and share his rehab story. It is worth noting the Plaintiff's surname is meaningful in both the sports and military verticals, with an uncle, Tom Verducci, who serves as a Major League Baseball broadcaster/journalist, an uncle Frank Verducci who coaches football at the University of Nebraska and previously in the National Football League, and lastly a father who is currently the Deputy Assistant Secretary of the Navy for Civilian Human Resources.

32.    In December 2022, Plaintiff met Michael Macri and Defendant David Hancock at the Major League Baseball ("MLB") Tech Expo in San Diego, California. Plaintiff gave Hancock a personal tour of the Navy SEAL Compound and the Hotel Del Coronado in San Diego, and Hancock began discussing the possibility of Apollo bringing Plaintiff on board to bolster Apollo's sales.

33.    In March 2023, Hancock invited Plaintiff to visit the Apollo office in White Plains, New York to meet the team and interview with Hancock and Mark Davis, Apollo's Chief Financial Officer. Apollo's "office" consisted of a single, windowless room on loan from a company called Bruin Capital

34.    Hancock then took Plaintiff to the New Canaan Country Club in New Canaan, Connecticut to meet Hancock's friends and hosted Plaintiff at his home during the visit.

35.    On March 14, 2023, Hancock sent an offer letter to Plaintiff via email. The letter offered a 20 percent ownership stake in all military revenue (a vertical in which Apollo had zero deals or traction). The letter also included sales goals of four deals per quarter, each weighted to be worth $60,000.00. This weighting was false and misleading, given that Apollo had approximately 20 clients at the time and that no more than two of those 20 clients paid more than $30,000.00 a year.

36.    Plaintiff responded to the offer letter by email, pointing out that the references to

9

military revenue had to be removed given the non-existence of such business at Apollo. Plaintiff also requested that part of the employment agreement include a healthcare voucher if Apollo was not going to provide health insurance.

37. On March 28, 2023, Plaintiff signed an employment contract with Apollo. The contract was addressed to Plaintiff's then-current residence at 3711 Washington Woods Drive, Alexandria, VA 22309.

38. Until May 2023, Plaintiff typically performed his work for Apollo remotely.

39. In May 2023, Plaintiff spent his first official day at Apollo's White Plains office to prepare for the College Strength and Conditioning Coaches Association Conference ("CSCCA"). By the time of his arrival, CFO Mark Davis was no longer employed by Apollo and did not retain any affiliation with the Company.

40. As Plaintiff and Macri prepared for the CSCCA conference, Hancock exploded into the room and said to Macri, "I've hired your buddy, now I need more sales." Plaintiff had not received any compensation (payment was tardy) before this outburst and had been an employee of the Company for less than a month.

41. Hancock often blurred the line between executive and "buddy," switching between the two as it suited him. For example, in the runup to the CSCCA conference, Hancock had Plaintiff and Macri stay at Hancock's home for a week to save money, but provided no food or transportation allowances to Plaintiff (as his contract required) and went so far as to verbally abuse Macri for eating Hancock's household food.

42. Further indications of Hancock's lack of character became evident to Plaintiff when, at the CSCCA Conference, Hancock and Apollo held a raffle for two complimentary tickets to a Red Hot Chili Peppers concert at a venue of the winner's choosing. But when a young woman from the University of North Dakota won the raffle, Hancock forced Plaintiff and Macri to advise the woman that she was not going to get the tickets.

43.     Yet another indication of Hancock's lack of character and volatile leadership style was his penchant for blaming Plaintiff and Macri for lost sales of which he himself was the cause.

44.     For example, when the University of Tennessee sent Hancock a termination letter after just one year into a three-year contract, Hancock blamed Macri for the termination.

45.     When in May 2023 Plaintiff received a verbal acceptance of a sale from the Brazilian Olympic Committee for three years at $60,000 per year with a one-time $15,000 on-boarding fee, Hancock lost the deal by voluntarily offering the Committee a demo of the Apollo system before purchasing and would not allow Macri to train Committee staffers on the demo because he was still angry over the loss of the University of Tennessee deal. He handed the training off to Jeff Velleca, who was not as well versed in high performance practice given his IT background.

46.     In June 2023, Plaintiff and Macri were trying to close deals with colleges and universities with whom they had had multiple points of contacts and demos. Hancock literally bet them $1,000 of his own money that they would not close the deals. Taking this animus and paranoia to the next level, Hancock began going over the heads of Plaintiff and Macri, squandering deals in the process. For example, the University of Florida's High-Performance Practitioner was intrigued by the Apollo demo and specifically told Plaintiff, "Give me a week or so and please do not message over my head (i.e., to the school's Athletic Director)." When Plaintiff advised Hancock of that warning, Hancock ignored it, emailed the AD, cc'd the Practitioner, and lost any potential for a deal, soiling Plaintiff's reputation in the process.

47.     Later that Summer, Plaintiff and Macri attended the NBA Tech Expo and created sales opportunities with the New York Knicks and the NBA League Medical Team. But Hancock shut Plaintiff and Macri out from any further communications with the Knicks to cut the two off from any commission revenue given Hancock's previous employment with the Knicks. Once again, however, Hancock was unable to close the deal and blamed Plaintiff and Macri for his own

11

failure.

48.     Hancock shut Plaintiff out of several other leads despite the fact that Plaintiff was Apollo's only sales rep, including calls with the Milwaukee Brewers, the Montreal Canadiens, Chicago Fire, and dozens of overseas entities.

49.     In July 2023, while Plaintiff and Macri were in Virginia visiting a client with the Washington Nationals, Hancock called Macri, said, "This isn't working," and fired Macri over the telephone. Hancock then set up a Zoom call with Plaintiff to discuss how to handle the firing. Plaintiff advised Hancock to place Macri under Plaintiff's supervision so that Hancock would not have to deal with him directly and further advised Hancock to set a target date for the end of Macri's employment that would allow Macri to renew his work visa and remain in the U.S. as a performance practitioner. Hancock agreed, but then went against his word and fired Macri anyway.

50.     As Macri was out-processing from Apollo, Hancock tried to force Macri to sign a non-disparagement agreement and an NDA for the Company's SOC-2 compliance certification application. Hancock even went so far as to direct Plaintiff to coerce Macri into signing the NDA.

51.     Three months later, Hancock tried to coerce Plaintiff into signing a back-dated NDA, but Plaintiff refused. Plaintiff did sign an NDA with a date concurrent with his signature but recognized Hancock's consistent willingness to falsify documents at Apollo.

52.     In August 2023, Plaintiff took over as the customer success agent for Macri's accounts because Hancock did not hire anyone to take Macri's place. One of those accounts was the Florida Panthers. The Panthers refused to pay for their upcoming season and notified Hancock that the team was not going to renew its contract. Once again, Hancock blamed Macri, despite the fact that Macri was no longer with the Company. The Vice President of Sports Performance at the Florida Panthers would only take calls and texts from Plaintiff and consistently ignored messages from Hancock. Hancock then began to construct messages and to send them through Plaintiff's

12

email address without Plaintiff's consent. The Panthers told Plaintiff that Hancock had promised the team a "Ferrari" and only delivered a "Mazda," that they had signed knowing that Macri was extremely responsive, and that they were not happy upon hearing that Macri had been terminated without consulting the team.

53.     In September 2023, Plaintiff closed a 3-year deal worth $40,000 per year with the University of Alabama football program. Falsely claiming that the deal only came to fruition because Hancock relentlessly pestered the school, Hancock repeatedly stated that Plaintiff was not responsible for closing the deal, a claim with which all of Plaintiff's co-workers vehemently disagreed. Plaintiff now found himself in a position of having to fight for every one of his sales despite being the Company's only sales rep.

54.     In November 2023, Hancock announced to Plaintiff that "this thing is really taking off," the "thing" being the sports science business. As a result, Hancock told Plaintiff that Hancock had decided to hire and insert a "direct line manager" – someone named Bo Wandell -- between Plaintiff and Hancock, in direct abrogation of Plaintiff's employment agreement, an extraordinary irony given that the only reason the "thing was taking off" was because of the University of Alabama deal (for which Plaintiff had not been paid a commission, again in derogation of his contract) and because of the power and prestige of the Alabama Football brand and other brands Plaintiff and Macri had brought in to date. Moreover, it was Plaintiff, not Hancock and certainly not Wandell, who spent significant amounts of time putting out fires with current clients such as the Washington Nationals and the University of Southern California, both of whom were complaining bitterly about Hancock's false promises.

55.     Plaintiff promptly pointed that out to Hancock and, while expressing a willingness to meet with Wandell, made clear that Plaintiff's employment contract would have to be renegotiated were Wandell hired.

56.     Hancock hired Wandell the day before Thanksgiving without restructuring

Plaintiff's contract as Plaintiff had requested.

57.     Plaintiff then requested a one-on-one meeting with Wandell to defend Plaintiff's vertical ownership position in the Company, to make clear that he had not joined the Company to serve as a mere sales rep, and that he would work with Wandell as a team player while his contract was restructured.

58.     Wandell, who had just joined Apollo, laughed in Plaintiff's face, mocked his service and leadership experience as a naval officer and veteran, and told Plaintiff he was unqualified to hold the title Hancock had given to Wandell. Plaintiff responded that he did not want the conversation to escalate and excused himself from the meeting.

59.     After Thanksgiving, Plaintiff submitted an application on behalf of Apollo, under the directive of Hancock, to attend the MLB Tech Expo in Nashville, Tennessee. But after MLB accepted the application, and after Plaintiff communicated to MLB that Apollo would be pleased to attend, Hancock and Wandell reversed course and decided that Apollo would not attend the Expo, claiming that it was "too expensive" despite the fact that participation was free. Plaintiff then told Hancock and Wandell that he would take personal time off and pay for his own travel to and from the expo to continue patching the relationship between Apollo to the Washington Nationals and to assist the MLB event staff after taking a spot at the Expo that might have gone to another applicant.

60.     By December 2023, Hancock and Wandell were embarking on efforts to create the most toxic work environment possible for Plaintiff. The two started recording group video calls with Plaintiff, against Plaintiff's will, and to conduct an impromptu "9-month performance review," despite the fact that Plaintiff had only been with the Company for seven months. Wandell himself had only been with the Company for two weeks. This so-called performance review was not based on any performance evaluations or metrics other than revenue. It was, in short, a personal assault, capped by Hancock's comment that he "wanted the old Matt back;" in other

14

words, the non-whistleblower Matt. The Matt who had not pointed out that several members of the Company were working without contracts, that Hancock verbally abused several staff members to suppress their feedback, and that Hancock selectively applied procedural compliance (e.g., forcing Macri to sign an NDA and trying to coerce Plaintiff into signing a back-dated NDA) when it suited his agenda. Plaintiff further pointed out that Hancock consistently denied vacation days to employees, forced employees to work on federal holidays, and ensured no logs of such dates were maintained.

61. Apollo did not use or possess a client relationship management ("CRM") system until Plaintiff built it for the Company on an application called HubSpot, a system Apollo uses to this day. When Plaintiff asked Hancock to upgrade the application, Hancock claimed that the Company did not have the money to do so. Yet when Wandell joined Apollo, Hancock paid Wandell up front for a six-month contract and provided him with an upgraded version of HubSpot.

62. On December 18, 2023, Hancock and Wandell recorded yet another call with Plaintiff against his will and without his consent. Given how toxic the workplace had become, even more so after Wandell's hiring, Plaintiff eventually asked that he speak with Hancock alone. Hancock insisted that he get the "old Matt" back and asked Plaintiff if he wanted to remain at the Company. Plaintiff responded in the affirmative and added that he intended to finish out the duration of his contract, despite the incredibly difficult conditions under which he was working. Plaintiff then suggested a severance plan whereby he would train a new hire on Plaintiff's sales processes while Plaintiff transitioned to a new opportunity. Most importantly, Plaintiff expressed a strong desire to leave with love and respect.

63. Hancock's response to that last point was, "I'll do you one better. I am not paying you for this pay period. You're done today and you will not receive another dollar." Plaintiff then pointed out that he had not received *any* of his commissions or healthcare vouchers and stressed that he was not an at-will employee who could simply be fired for no reason. To that, Hancock

15

responded, "Well . . . my lawyers versus your lawyers."

64.     Later the same day, Plaintiff received an 18-page document from Dave Hancock (with a gentleman named Jason Putter cc'd along with Jeff Velleca and Charmaine Johns). purporting to be an at-will employment agreement dated April 1, 2023, the same date to which Apollo tried, but failed, to back-date the NDA Plaintiff ultimately signed.  Plaintiff had never signed any such document, and when he looked at the signature in the signature block, he immediately realized that the signature was forged.  Underneath the forged signature was a home address in California at which Plaintiff had not lived since March of 2020     and was not the Virginia address reflected on Plaintiff's employment contract.

65.     Apollo scheduled an exit interview for December 20, 2023 for Hancock, Wandell, the head of IT, and an IT contractor.  Hancock and Wandell did not show up for the interview. Plaintiff asked his father, an attorney, to sit in on the interview with him.  The two Apollo representatives recorded the call, to which Plaintiff and his father would only agree on condition that they be proved with a copy of the recording.  The Apollo representatives agreed to that condition. The call was cut short, however, once the Apollo representatives came to the realization that neither of them had the management or human resources credentials necessary to participate.

66.     Several days later, someone purporting to serve as Apollo's outside counsel told Plaintiff that he would not be receiving a copy of the recording of the "exit interview" and that the lawyer would only speak to an attorney representing Plaintiff.

67.     For months after Plaintiff was wrongfully terminated, Apollo continued to use Plaintiff's likeness and image in marketing and promotional materials without Plaintiff's consent and without compensating Plaintiff for such use.

## COUNT I
### (Whistleblower Violation)

59. The Plaintiff, Matthew Verducci, reported illegal and unethical conduct by the defendants, Apollo LLC and David Hancock. This conduct included backdating and falsifying important documents, making material misrepresentations to clients, and other actions that could potentially harm the public interest or violate laws. The Plaintiff reported these activities directly to Defendant Hancock, thus the employer was aware of the whistleblowing activities. Following his reports, the Plaintiff was subjected to a series of retaliatory actions by the Defendants. These included harassment, creation of a hostile work environment, and ultimately, wrongful termination. Such actions are detailed through various instances in the complaint, including the hiring of a "direct line manager" contrary to the employment agreement, recorded group video calls without consent for the purpose of harassment, and the Plaintiff's wrongful termination announced abruptly by Hancock. There is a clear causal connection between the Plaintiff's whistleblowing activities and the adverse employment actions taken against him. The retaliatory nature of these actions is highlighted by the timing and context in which they occurred, following the Plaintiff's reports of misconduct. The actions reported by the Plaintiff and the subsequent retaliation he faced are alleged to violate New York Labor Law § 740, which protects employees from retaliatory actions by their employers for reporting illegal or unethical activities.

60. Plaintiff Matthew Verducci alleges that Defendants Apollo LLC and David Hancock engaged in illegal and unethical conduct, including but not limited to backdating and falsifying important documents and making material misrepresentations to clients. Plaintiff, in good faith, reported these activities to Defendant Hancock and was subjected to retaliation, including harassment, creation of a hostile work environment, and wrongful termination, in violation of New York State whistleblower protection laws. Plaintiff seeks damages, reinstatement, and other appropriate relief under the applicable state whistleblower protection statutes.

## COUNT II
### (Fraud in the Inducement)

61. Plaintiff alleges that Defendants, through Defendant Hancock, made intentional and material misrepresentations regarding the nature of the employment agreement, the financial health and business prospects of Apollo LLC, and the expected compensation and benefits. These misrepresentations induced Plaintiff to enter into an employment agreement with Apollo LLC. Plaintiff seeks rescission of the employment agreement and/or damages for detrimental reliance on Defendants' fraudulent statements. The foregoing allegations outline a pattern of behavior by the Defendants that created a hostile work environment for the Plaintiff. This includes instances where the Plaintiff was excluded from pursuing leads, mocked for his leadership and operational experience, and subjected to verbal abuse. These actions constitute direct retaliation for the Plaintiff's whistleblowing activities, by which he reported unethical and illegal conduct by the Defendants. Under New York Labor Law § 740, retaliatory actions that create a hostile work environment for an employee who has engaged in protected activities constitute a violation of the law. The conduct of Defendants to induce Plaintiff to enter into an employment relationship based on misrepresentations regarding his responsibilities and compensation, and the subsequent intentional creation of a toxic work environment with retaliatory conduct after using Plaintiff's hard work without the promised compensation, fraudulently induced the Plaintiff to work for Defendants.

## COUNT III
### (Breach of Partnership Agreement)

62. Plaintiff alleges that the employment agreement constituted a partnership agreement, granting Plaintiff a stake in certain revenues and decision-making authority. Defendants breached this agreement by failing to pay Plaintiff commissions and salary owed, hiring a direct line manager in contravention of the agreement, and ultimately wrongfully terminating Plaintiff. Plaintiff seeks damages for breach of contract, an accounting of profits, and equitable relief.

## COUNT IV
### (Unauthorized Use of Likeness or Image)

63. Plaintiff alleges that Defendants continued to use Plaintiff's likeness and image in marketing and promotional materials without Plaintiff's consent, in violation of Plaintiff's right of publicity under New York law. Plaintiff seeks damages for the unauthorized use and injunctive relief to prevent further use of Plaintiff's likeness and image.

## Count V
### (Unjust Enrichment)

64. Plaintiff alleges that Defendants were unjustly enriched by Plaintiff's work, expertise, and contributions to the business, without providing the agreed-upon compensation. Defendants' retention of the benefits of Plaintiff's work without compensation constitutes unjust enrichment. Plaintiff seeks restitution and disgorgement of Defendants' unjust gains.

Dated:

## JURY DEMAND

Plaintiff hereby demands a jury trial in this matter.

/s/ Mary Ann Kricko

**MARY ANN KRICKO**
25 East Spring Valley Avenue
Maywood, NJ 07607
and
7 Penn Plaza, Suite 1606
New York, NY 10001
(551) 486-3549
maryannkricko@me.com

/s/ Jeffrey E. McFadden

**JEFFREY E. MCFADDEN**
Law Offices of Jeffrey E. McFadden, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
(443) 272-4737
jmcfadden@jmcfaddenlaw.com

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

-----------------------------------------------------------X
                                        :
MATTHEW VERDUCCI,                       :
                    Plaintiff,          :         Index No. 66159/2025
                                        :
v.                                      :
                                        :
APOLLO LLC and DAVID HANCOCK,           :         **NOTICE REGARDING**
                    Defendants.         :         **REMOVED ACTION**
                                        :
-----------------------------------------------------------X

     PLEASE TAKE NOTICE that, on July 30, 2025, defendants Apollo LLC and David

Hancock filed a Notice of Removal of this case from the Supreme Court of the State of New

York, Westchester County to the United States District Court for the Southern District of New

York. A copy of this Notice and the Notice of Removal has also been provided to counsel for

plaintiff Matthew Verducci.

     Defendants also filed a copy of the notice of Removal with the Clerk of the Supreme

Court of the State of New York, Westchester County, in accordance with 28 U.S.C. §1446(d).

Dated: July 30, 2025
     Stamford, Connecticut     Respectfully

     By: */s/ Mark S. Gregory*
          Mark S. Gregory (MG0914)
          Martin LLP
          One Landmark Square
          Stamford Connecticut 06902
          Tel: (203) 973-5210
          Fax: (203) 973-5250
          E-Mail: mgregory@martinllp.net

          *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

This is to certify that on July 30, 2025, a copy of the foregoing Notice Regarding

Removed Action is being served by electronic mail to all counsel as follows:

Mary Ann Kricko
25 East Spring Valley Avenue
Maywood, New Jersey 07607
maryannkricko@me.com

Jeffrey E. McFadden
Law Offices of Jeffrey E. McFadden, LLC
312 Prospect Bay Drive East
Grasonville, Maryland 21638
jmcfadden@jmcfaddenlaw.com

/s/ Mark S. Gregory
Mark S. Gregory (MG0914)
Martin LLP
One Landmark Square
Stamford Connecticut 06902
Tel: (203) 973-5210
Fax: (203) 973-5250
E-Mail: mgregory@martinllp.net

*Attorneys for Defendants*